# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 2001-CA-01045-COA

**WILLIE BOWIE, INDIVIDUALLY AND ON BEHALF OF THE HEIRS AT LAW OF LOIS BROWN, DECEASED**                     APPELLANT

**v.**

**MONTFORT JONES MEMORIAL HOSPITAL; KOSCIUSKO MEDICAL CLINIC; PERRY LISHMAN, M.D.; GARY HOLDINESS, M.D.; RICHARD CARTER, M.D.; AND TIMOTHY ALFORD, M.D.**                     APPELLEES

| | |
|---|---|
| DATE OF TRIAL COURT JUDGMENT: | 06/19/2001 |
| TRIAL JUDGE: | HON. JOSEPH H. LOPER JR. |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ISAAC K. BYRD JR. |
| | KATRINA M. BIBB GIBBS |
| | RAMEL LEMAR COTTON |
| ATTORNEYS FOR APPELLEES: | STEPHEN P. KRUGER |
| | GEORGE QUINN EVANS |
| | HEBER S. SIMMONS III |
| | LYNDA CLOWER CARTER |
| | TINA LORRAINE NICHOLSON |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| TRIAL COURT DISPOSITION: | DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT GRANTED. |
| DISPOSITION: | REVERSED AND REMANDED - 10/29/2002 |
| MOTION FOR REHEARING FILED: | |
| CERTIORARI FILED: | |
| MANDATE ISSUED: | |

EN BANC:

KING, P.J., FOR THE COURT:

¶1. Willie Bowie appeals the grant of summary judgment to Montfort Jones and the other appellees by the Circuit Court of Attala County. Finding the grant of summary judgment to have been improper, this Court reverses and remands.

## STATEMENT OF FACTS

¶2. On June 13, 1998, Lois Brown, sixty-seven years of age, was brought to Montfort Jones Memorial Hospital by ambulance suffering the aftereffects of a seizure. It was noted at admittance that Mrs. Brown had a history of alcohol-induced seizures and that her blood alcohol content was .19%. Mrs. Brown had a four-inch laceration on her scalp that had been stapled closed. Mrs. Brown had apparently been consuming both beer and whisky at her home which had no air-conditioning on a day when the heat index in Kosciusko reached 110 degrees Fahrenheit. After a CT scan, it was also noted that Mrs. Brown had a "bur hole" in her left temple which had resulted from a past craniotomy.

¶3. Mrs. Brown's condition showed improvement over the next two days. However on June 16th, Mrs. Brown's condition began to deteriorate. Throughout the evening of the sixteenth and the early morning hours of the seventeenth, Mrs. Brown became increasingly unresponsive. Mrs. Brown died on June 17, 1998. The cause of death was determined to be a cerebral hemorrhage which caused both heart and lung failure.

¶4. On November 24, 1999, Willie Bowie, individually and as representative of Mrs. Brown's heirs, filed suit against Montfort Jones Memorial Hospital, Kosciusko Medical Clinic, several physicians, and an unidentified nurse or nurses. The suit alleged that Montfort Jones, the medical clinic, doctors, and nurses were negligent in failing to provide Mrs. Brown with a "nationally recognized minimal" level of care, which caused her death. The defendants' answer denied any negligence.

¶5. On August 16, 2000, an agreed scheduling order was entered by the trial judge. All discovery, including depositions, was to be completed by March 1, 2001. The plaintiffs were to designate an expert no later than December 31, 2000, and the defendants were to designate experts by January 31, 2001. The order provided that the designation of expert witnesses should include all information required to be disclosed under Mississippi Rule of Civil Procedure 26(b)(4)(A). The order stated the deadlines could "not be extended by agreement of the parties, but only by permission of the Court upon showing of good cause."

¶6. No plaintiff's expert was designated by the December 31, 2000 deadline. Montfort Jones designated an expert witness on January 26, 2001. It also adopted as an expert any expert designated by the other defendants. The medical clinic and the physicians designated experts on January 31, 2001.

¶7. On the same day it designated an expert, Montfort Jones also filed a motion for summary judgment. The physicians filed a similar motion for summary judgment with their designation of experts. They contended that the alleged negligence in this matter was not of the type "within the practical knowledge and experience of lay persons," and would require expert testimony. Without an expert, the defendants argued that a *prima facie* case of medical malpractice could not be made. The medical clinic later filed its own summary judgment motion.

¶8. On February 5, 2002, the plaintiffs designated Dr. Obie NcNair as an expert witness. The designation stated that Dr. McNair would testify that the defendants did not properly monitor Mrs. Brown, did not administer blood gas tests, did not provide daily electrolytes, and gave Mrs. Brown too much potassium. Dr. McNair would testify that the high level of potassium caused Mrs. Brown's "cardiac malfunctioning." On February 28, 2001, the plaintiffs filed an affidavit from Dr. McNair. The affidavit stated that it was Dr. McNair's opinion "to a reasonable degree of medical [probability], that the death of Mrs. Brown could have been avoided if proper monitoring of her heart and blood chemistries had been . . . attended to more closely."

¶9. Motions for summary judgment along with motions to strike the plaintiff's late designation were heard on March 5, 2001. At the hearing, plaintiffs' counsel submitted a motion for extension of time to designate an expert, seeking a retroactive order permitting the late designation. The circuit judge found the motion for extension of time untimely as it was filed "over two months after the deadline for designation of expert witnesses had passed and over a month after one or more of the Defendants' Motion for Summary Judgment were filed." The circuit judge noted that the motion claimed the original deadline was not met due to counsel's attendance at other trials or legal proceedings but that counsel offered no evidence such as calendars to support the claim.

¶10. The court found that because the plaintiffs had not designated an expert in compliance with the agreed scheduling order that no *prima facie* case of medical malpractice could be made against any of the defendants.

¶11. The court also found that even if the late-designated expert's affidavit was accepted despite its tardiness, it was inadequate to defeat a motion for summary judgment.

## DISCUSSION

¶12. On March 5, 2001, the Attala County Circuit Court granted several motions for summary judgment filed by the various trial court defendants. The trial court gave as the primary reason for its grant of summary judgment the failure of Bowie to timely designate an expert witness.

¶13. Then, almost as an afterthought, the trial court held that Bowie's proffered affidavit was insufficient as a matter of law, and even if accepted would not have altered the grant of summary judgment to the trial defendants.

¶14. In rendering its decision on March 5, 2001, the trial court did not have the benefit of *Thompson v. Patino*, decided by the Mississippi Supreme Court on May 10, 2001, and found at 784 So. 2d 220. The facts of *Thompson,* as stated by Justice Waller, are remarkably similar to Bowie, and bear inclusion in their entirety. They are as follows:

> On February 9, 1993, Karin King Thompson underwent neurological surgery at St. Dominic-Jackson Memorial Hospital in Jackson, Mississippi. The surgery was performed by John P. Gorecki, M.D., with Carlos S. Patino, M.D., serving as anesthesiologist. Following surgery, Thompson's tongue became severely swollen. As a result, she began experiencing breathing difficulty and went into cardiac arrest. Medical personnel performed an emergency tracheostomy. On February 16, 1994, Thompson filed this suit for damages in the Circuit Court of the First Judicial District of Hinds County, Mississippi, alleging medical malpractice and naming Dr. Patino, St. Dominic, and ten unnamed individuals as defendants.

> On March 11, 1994, St. Dominic served Thompson with interrogatories and requests for production of documents. On March 15, 1994, Dr. Patino did likewise. One of Dr. Patino's interrogatories requested that Thompson name the experts whom she intended to call at trial and the substance of the facts and opinions about which the experts were expected to testify.

> After Thompson failed to respond to the discovery requests, on May 16, 1994, and June 8, 1994, St. Dominic and Dr. Patino filed motions to compel. On June 17, 1994, the circuit court ordered

Thompson to respond to the discovery within 7 days.

On June 24, 1994, Thompson served St. Dominic and Dr. Patino with her responses to their interrogatories. Therein she named Bernard Patrick, M.D., and William Cause, M.D., as expert witnesses but she failed to state what their opinions would be.

On July 14, 1994, Thompson filed a motion for extension of time to conduct discovery. On February 10, 1995, Thompson amended her complaint to add Dr. Gorecki as a defendant. By agreed order dated September 25, 1995, the circuit court extended discovery for 90 days.

In September, 1996, Thompson deposed Dr. Gorecki.

On October 18, 1996, Thompson requested an additional 60 days of discovery. The trial court denied this request by order dated December 23, 1996.

In November, 1996, Thompson's counsel's office was destroyed by fire, and her file had to be reconstructed.

On February 5, 1997, Dr. Patino filed a motion to dismiss, or, alternatively, for summary judgment. Prior to the filing of Dr. Patino's motion, Thompson had not supplemented her responses to interrogatories.

On February 10, 1997, Thompson supplemented her responses to interrogatories to St. Dominic and Dr. Patino, and named for the first time William Wilson, M.D., as an expert in neurosurgery, and Herbert Ferrari, M.D., as an expert in anesthesiology.

On February 14, 1997, Dr. Patino filed a motion to strike Thompson's supplemental responses.

On February 18, 1997, Thompson filed her response to Dr. Patino's motion for summary judgment. On February 21, 1997, Thompson filed Dr. Ferrari's affidavit wherein he averred that Dr. Patino breached the duty of care owed to Thompson.

In response to Dr. Patino's motion to strike her supplemental responses, Thompson argued that she had learned additional information during Dr. Gorecki's deposition that caused the delay in naming Dr. Wilson and Dr. Ferrari as expert witnesses. On March 24, 1997, the circuit court granted the motion to strike, finding that Thompson has sued Dr. Patino in 1994 and could have proceeded against Dr. Patino no matter what Dr. Gorecki said in his deposition. Therefore, awaiting Dr. Gorecki's deposition was not a legitimate excuse for failure to name her experts as to Dr. Patino. The circuit court found that the supplemental responses were tardy and should be stricken.

On March 31, 1997, Dr. Patino moved to strike Dr. Ferrari's affidavit. Dr. Patino argued that, because the discovery responses naming Dr. Ferrari as an expert witness had been stricken, Dr. Ferrari could not testify at trial and he could not submit an affidavit opposing summary judgment. By order dated July 10, 1997, the circuit court struck Dr. Ferrari's affidavit and granted summary judgment for Dr. Patino.

On August 5, 1997, the trial court granted summary judgment as to Dr. Gorecki.

On August 13, 1997, the trial court granted summary judgment as to St. Dominic.

On appeal, noting that Thompson had filed suit in February, 1994, was given until December, 1995, to complete discovery, and filed the discovery responses pertaining to her expert witnesses in February, 1997, the Court of Appeals found that the circuit court had not abused its discretion in striking the discovery responses and expert affidavit. Thompson v. Patino, No. 97-CA-00971-COA (Miss. Ct. App. May 18, 1999). Furthermore, because Thompson had no expert witnesses or affidavits in support of her claims, the Court of Appeals found that the circuit court did not err in granting summary judgment in favor of the defendants.

*Thompson v. Patino*, 748 So. 2d 220 (¶¶ 4-20) (Miss. 2001)

¶15. Notwithstanding these facts, our Supreme Court held that absolute and final dismissal, by way of summary judgment, was too draconian a penalty for a discovery violation. The court stated:

> The circuit court, in making its ruling, gave a detailed recitation of the events of the case and obviously felt that the failure of Thompson's counsel was deliberate or at least seriously negligent. Sanctions were appropriate, but the exclusion of medical expert evidence which prompted the dismissal of Thompson's action amounted to an abuse of discretion under the facts of this case.

*Id.* at (¶25).

¶16. In the present case, it may well have been appropriate to impose sanctions for Bowie's failure to timely designate an expert witness. However, the facts do not justify the ultimate penalty of summary judgment.

¶17. In *Thompson,* the trial judge had declined to even consider the tardy affidavit of the proffered expert. Upon remand he was directed to "impose a less severe sanction" and decide the summary judgment motion after consideration of all responses and affidavits.

¶18. In this case the trial court, almost as an after thought, indicated some consideration of the affidavit, stating:

> The motion to strike designation of experts is granted. Because there is no expert witnesses now before this court, the motion for summary judgment filed by each of the defendants is granted.
>
> The court also wants to go forward on the record and state that this court has examined the affidavit of Dr. Obie McNair. This court finds that his affidavit is woefully lacking in that it fails to allege duty, breach of duty and causation as to each of the defendants.
>
> Therefore, this court, even if the designation of expert had been properly filed and this testimony was properly before this court, this court would find that is not sufficient proof necessary to defeat a motion for summary judgment.
>
> And that is the order of the court.

¶19. The affidavit of Dr. McNair states:

1.

> My name is OBIE McNAIR, M.D., and I am a citizen of Jackson, Mississippi, and fully competent to give this affidavit consisting of three pages.

2.

I am a physician specializing in the area of internal and pulmonary medicine and have been practicing for fifteen years.

3.

I have reviewed the records from Montfort Jones Hospital, and have formed an opinion which is based on my review of the above as well as my training and experience.

4.

During the hospitalization of Ms. Lois Brown from June 13, 1998 thru June 17, 1998, her potassium level was drawn on admission, on June 14 and then not until June 17. During this time she was continuing to have potassium added to her intravenous fluids at the rate of 40 Meq. per 1,000 cc. with an infusion rate of 125 cc per hour. Her admission potassium level was 3.5, a low normal value. On June 14th, it was 4.5 and then on the 17th it was 7.7, or critically high.

5.

It is my opinion that the high potassium value caused the peaked T-waves, thus causing a heart arrythemia and also an electrolyte imbalance. The cardiac monitor was checked on 6/14 at 7:00 am, 3:00 pm and 11:00 pm. On 6/15 it was checked at 7:00 am, 3:00 pm. On the 16th, it was checked at 7:38 a.m., and then on the 17th at 8:01 am. Thus, the heart monitor should have been checked on the 15th at 11:00 pm and on the 16th at both 3:00 and 11:00 pm. Proper heart monitoring could have indicated the cardiac arrythemias. Peaked T-waves were noted by the telemetry nurse.

6.

There was only one Arterial Blood Gas taken on 6/14 at 8:54. Further monitoring would have indicated if she was retaining CO2. The PCO2 value on that day was 45.5, a high normal value.

7.

Therefore, it is my opinion to a reasonable degree of medical probably,[sic] that the death of Ms. Brown could have been avoided if proper monitoring of her heart and blood chemistries had been monitored and attended to more closely.

¶20. On motion for summary judgment, the movant bears the burden of establishing that no genuine issue of material fact exists. *Roebuck v. McDade*, 760 So. 2d 12 (¶12) (Miss. Ct. App. 1999). The party moving for summary judgment, "must establish the propriety of relief by the strengths of his own showing. . . . " *Davidson v. North Central Parts, Inc.,* 737 So. 2d 1015 (¶12) (Miss. Ct. App. 1998).

¶21. The party against whom summary judgment is sought is accorded the benefit of the doubt. *Dailey v. Methodist Center,* 790 So. 2d 903 (¶3) (Miss. Ct. App. 2001).

¶22. According to Dr. McNair, the heart monitor should have been checked on June 15th at 11:00 p.m., on June 16th at 3:00 p.m. and 11:00 p.m. This clearly infers a duty. The breach of that duty is made clear in

the next sentence, when Dr. McNair states, "**Proper** heart monitoring could have indicated the cardiac arrythemias." The term "proper," as defined in the American Heritage Dictionary (3rd ed.) means appropriate or suitable. The failure to provide **prope**r care is a breach of duty.

¶23. Dr. McNair concludes his affidavit by stating "the death of Ms. Bowie could have been avoided if **proper** monitoring of her heart and blood chemistries had been monitored and attended to more closely." This statement is not a mere inference of causation, but is a declaration of causation. The duty to monitor was an obligation of each of Mrs. Brown's health care professionals. *Dailey v. Methodist Center,* 790 So. 2d 903 (¶14) (Miss. Ct. App. 2001). That duty, according to Dr. McNair, was not honored.

¶24. Summary judgment should only be granted when it is shown that " there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." M.R.C.P. 56(c). There is a genuine issue of fact in this case. That issue is whether the deceased received proper medical care from the defendants. The affidavit of Dr. McNair indicated that the deceased did not receive proper medical care.

¶25. Dr. McNair states the facts as taken from the defendants' records, and then sets forth what **should have been done**. He also sets forth, again based upon the records of the defendants, what was done. Taken together, those things put before the court the standard of care and the violation of that standard of care.

¶26. A summary judgment motion does not substitute for a trial. The summary judgment motion merely decides whether there are issues to resolve. *Robinson v. Ratliff,* 757 So. 2d 1098 (¶6) (Miss. Ct. App. 2000). The trial actually resolves the issues. Because Dr. McNair's affidavit raises a genuine issue of material fact, summary judgment should not have been granted.

¶27. **THE JUDGMENT OF THE CIRCUIT COURT OF ATTALA COUNTY IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THE APPEAL ARE ASSESSED TO THE APPELLEES.**

> **BRIDGES, THOMAS, IRVING, MYERS, AND CHANDLER, JJ., CONCUR. SOUTHWICK, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J., LEE, AND BRANTLEY, JJ.**

> SOUTHWICK, P.J., DISSENTING:

¶28. The majority reverses for two reasons. One is that a recent Supreme Court precedent is said to be remarkably similar regarding a discovery violation. Whatever its similarities or distinctions, I do not address that issue. What is clearer is that the trial court was correct that the plaintiffs failed to present any evidence that an applicable standard of care was violated. The majority calls that basis for judgment only an afterthought. I am not so confident about the order and intensity of the trial judge's thoughts. The reason is sound and is reviewable by this court in the same fashion regardless of whether it was the first or the last thing that the judge concluded.

¶29. On February 5, 2001, at the end of the summary judgment process, the plaintiffs designated Dr. Obie McNair as an expert witness. The designation stated that Dr. McNair would testify that the defendants did not properly monitor Mrs. Brown, did not administer blood gas tests, did not provide daily electrolytes, and gave Mrs. Brown too much potassium. Dr. McNair would testify that the high level of potassium caused

Mrs. Brown's "cardiac malfunctioning." On February 28, the plaintiffs filed an affidavit from Dr. McNair. The affidavit stated that it was Dr. McNair's opinion "to a reasonable degree of medical [probability], that the death of Mrs. Brown could have been avoided if proper monitoring of her heart and blood chemistries had been . . . attended to more closely."

¶30. Motions for summary judgment along with motions to strike the plaintiffs' late designation were heard on March 5, 2001. The trial court rejected the McNair affidavit because of its dilatory filing. The court also found that even if the affidavit were accepted, it was inadequate to defeat a motion for summary judgment. I agree with this second argument. What is apparent is that the plaintiffs' only evidence did not create a dispute of material fact on defendants' failure to conform to the standard of care. Summary judgment for all defendants was properly entered. I turn to the matter of what the plaintiffs needed but did not present at the time of summary judgment.

¶31. The plaintiffs' response to the defendants' motions for summary judgment originally consisted of one page with a copy of the designation of expert attached. This was not usable evidence, only pleadings. Three days before the summary judgment hearing, a three-page affidavit from Dr. Obie McNair was submitted. The relevant portion of the affidavit has been quoted in the majority opinion. The trial judge found the affidavit insufficient "to defeat a motion for summary judgment" because it was "woefully lacking in that it fails to allege duty, breach of duty, and causation as to each of the defendants."

¶32. To succeed "in a medical malpractice action, a plaintiff must establish, by expert testimony, the standard of acceptable professional practice; that the defendant physician deviated from that standard; and that the deviation from the standard of acceptable professional practice was the proximate cause of the injury of which plaintiff complains." *Brown v. Baptist Memorial Hospital DeSoto, Inc.*, 806 So. 2d 1131, 1134 (Miss. 2002). The Supreme Court has defined the standard of acceptable professional practice for a physician.

> Given the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient with such reasonable diligence, patience, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment, and options.

*Starcher v. Byrne*, 687 So.2d 737, 740 (Miss. 1997). It is with this definition that I analyze Dr. McNair's affidavit.

¶33. The affidavit does not describe or even mention a standard of acceptable professional practice for any of the four physicians that applied to a patient in Mrs. Brown's condition. The issue in the case is whether one or more of the defendants breached a relevant standard of care. A claim is not made by some other physician's conclusion that in hindsight a different result might have occurred if certain additional actions had been taken. Unless a defendant was negligent, i.e., unless the defendant failed to conform to the accepted standard of care, post-hoc explanations of what might have been a better approach do not support a claim for damages.

¶34. According to the affidavit's assertions, Mrs. Brown received too much potassium and more frequent monitoring would have been helpful. Yet there is no allegation that the monitoring that was provided fell below the standard of acceptable professional practice. Nothing in this affidavit details what each of the four

physicians did or failed to do in regards to the care provided Mrs. Brown that fell below the standard of acceptable professional practice. Nothing in this affidavit details what Montfort Jones Memorial Hospital, Kosciusko Medical Clinic, or the unidentified nurses did or failed to do in regards to the care provided Mrs. Brown that fell below the standard of acceptable professional practice.

¶35. The majority finds that the word "proper" sprinkled through the affidavit creates the necessary allegation of a standard of care. "Proper" is not a substitute for evidence of a standard of care. Nothing in the affidavit indicates that the affiant was aware of the standard of care for this treatment, that he had compared the defendants' actions to that standard, and that he had found the care wanting in specific respects. The doctor made no effort to assert that what was being described as "proper" care met an objective standard of care. This affidavit did nothing more than assert that the defendants did not do what they should have. That is not expertise; that is dissociated criticism.

¶36. Whether the plaintiff's physician was unaware of the need to describe a standard of care, or did not have the knowledge or had not performed the research necessary to identify the standard for the challenged medical procedures, or for some other reason failed to state an opinion as to the standard of care applicable to this case and the manner in which the defendants fell short, the result is the same. Nothing was presented to the fact-finder to make a case that the defendants failed to meet the standard of care.

¶37. An expert brought in to prove a plaintiff's case is supposed to have expertise. Making assertions of what would have been proper treatment without linking the propriety to its necessary source, namely, an understood and identified standard of care, means that the physician has not yet demonstrated that he has the needed expertise. It is not enough to be a doctor. Someone who is offered to testify as to the breach of a standard of care must be able to identify what the standard is. It does not matter with what words the expert identifies the standard. He may use magical words of "standard of care" or inartful words that express the same.

¶38. Had the plaintiff's physician been offered to testify at trial and would only say that what he would have required the defendants to do is the "proper" treatment, that testimony would properly have been found inadmissible. To have allowed such testimony over objection would be to hold that the "standard of care" element in a professional malpractice case is strictly a matter for individual assessment by a member of that profession who is willing to testify. Instead, it is a matter for the considered judgment of a number of professionals and generally accepted in the relevant part of the medical community. Without more, the trial judge could not determine whether the plaintiffs' version of what was proper was "junk science" or a professionally recognized standard of care.

¶39. Professional hindsight may well often discover, or at least cause a later physician examining the records to assert, what, had it been done a little differently, would have saved any particular patient. These defendant doctors as they were treating Lois Brown did not have the benefit of hindsight. They had a patient with identified ailments whom they were treating. It is not mere semantics to require that those who would make a case of professional malpractice to show not only what would have helped this particular patient this particular time, but to demonstrate that what the doctors could have done is actually what is required by the standard of care.

¶40. When those two matters become one, when what might in retrospect have helped this patient this time becomes after-the-fact the standard of care, then physicians have become the insurers for their patients. Doctors usually only get one opportunity to save a patient; whether they performed appropriately with that

one opportunity depends on the standard of care, not on hindsight, or on what was better, or desirable, or proper. That distinction is not magic words; it is the law.

¶41. A defense motion for summary judgment puts plaintiffs to the test of whether there is a dispute of material fact sufficient to justify a trial. Pleadings and argument are no longer enough. The response here was inadequate. There was no evidence from the plaintiffs of the relevant standard of care, of how defendants' actions fell short of that standard, and that Mrs. Brown's death was the proximate result of that failure to maintain the standard of care. I would affirm.

**McMILLIN, C.J., LEE AND BRANTLEY, JJ., JOIN THIS SEPARATE WRITTEN OPINION.**